UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/10/2022

CHAMMA K. BRANDON,

                    Plaintiff,

      v.

TASBIRUL M. ALAM,

                    Defendant.

18 CV 10158 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**OPINION AND ORDER**

      Plaintiff Chamma Kareem Brandon ("Plaintiff") brings this action *pro se* pursuant to 42 U.S.C. § 1983, against Defendant Dr. Tasbirul M. Alam ("Dr. Alam" or "Defendant"), asserting a claim for violation of his right under the First Amendment to file a lawsuit. Plaintiff also requests that the Court issue an injunction order for Defendant to issue a medical shower pass and award Plaintiff $1,000,000 in compensatory and punitive damages for the alleged injuries Plaintiff sustained from Defendant's alleged retaliatory actions. Before the Court is Defendant's motion for summary judgment on Plaintiff's First Amendment claim, which is brought pursuant

1

to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Defendant's motion is GRANTED.

## PROCEDURAL BACKGROUND

*Pro se* Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Dr. Alam alleging that after Plaintiff filed a medical malpractice suit against Dr. Alam, Dr. Alam retaliated against Plaintiff in violation of his First Amendment rights by denying him a medical shower pass. (ECF No. 20.) Defendant answered the Complaint (ECF No. 13), and the case was referred to Magistrate Judge Davison for discovery. (ECF No. 20.) Discovery was completed in January 2020. (Minute Entry dated January 16, 2020.) Defendant moved for summary judgment. (ECF No. 46.) In opposition to Defendant's motion, Plaintiff submitted and relied heavily upon the report of an expert dated April 20, 2020. (Exhibit C (ECF No. 54-3) and ECF No. 54.) In his reply, Defendant asked the court to preclude this expert report under Federal Rule of Civil Procedure 37(c) because Plaintiff failed to disclose his intention to rely on an expert or the expert report during discovery. (ECF No. 55.)

The Court dismissed Defendant's motion for summary judgment without prejudice and reopened discovery for the limited purpose of allowing Defendant to respond to Plaintiff's expert report. (ECF No. 56.) Defendant then moved for summary judgment for a second time. (ECF No. 76.) This motion is before the Court.

## FACTUAL BACKGROUND

The facts are gleaned from the Complaint ("Compl.") (ECF No. 2), Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") (ECF No. 79), and Plaintiff's Response to Defendant's Rule 56.1 Statement ("Plf. Resp.") (ECF No. 84) and are uncontested except where indicated.

2

*Emergence of Plaintiff's Skin Condition and Initial Treatment by Defendant Dr. Alam*

On or around May 29, 2015, Plaintiff was transferred from another New York State correctional facility to Sing Sing Correctional Facility ("Sing Sing"). (Def. 56.1 ¶ 1.) When Plaintiff was transferred to Sing Sing, he had several pre-existing medical conditions, but these did not include any sleep issues. (*Id.* ¶ 5.)

Defendant Dr. Alam alleges that he and Plaintiff met for an initial appointment in June of 2015, where he prescribed a new allergy medication and discontinued Plaintiff's prior allergy medication, which was not working.[1] (*Id.* ¶ 6.) On December 4, 2014, Dr. Alam prescribed Plaintiff Tylenol and Benadryl. (*Id.* ¶ 9-10.) The prescription of Benadryl was for 25 milligrams to be taken once per day and Dr. Alam prescribed both medications for Plaintiff's allergies and inability to sleep. (*Id.* ¶ 11.) Plaintiff's difficulty sleeping began when high intensity stadium styled lights were affixed fifteen feet in front of his cell. (Compl. ¶¶ 14-17.)

Plaintiff's next appointment with Dr. Alam was on February 5, 2016, during which Dr. Alam refilled Plaintiff's Benadryl prescription. (Def. 56.1 ¶ 12.) On or about March 10, 2016, Plaintiff filed a grievance complaining that Dr. Alam failed to issue him sleep medication. (*Id.* ¶ 13.) Plaintiff then saw Dr. Alam on March 21, 2016, when Plaintiff requested a sick call appointment for a rash. (*Id.* ¶ 14.) Dr. Alam prescribed Plaintiff a 10-day course of prednisone, an oral steroid, to treat his rash. (*Id.* ¶ 15.)

Plaintiff saw Dr. Alam again on March 24, 2016. (*Id.* ¶ 16.) During this visit, Plaintiff told Dr. Alam that Plaintiff had a history of eczema and Dr. Alam: (1) recommended that Plaintiff

---

[1] The parties dispute the exact date on which this initial appointment occurred. Dr. Alam states that the appointment occurred on June 8, 2022 (Def. 56.1 ¶ 6), whereas Plaintiff claims that he does not have sufficient knowledge or information to confirm the exact date or whether Dr. Alam changed his medication. (Plf. Resp. ¶ 6.)

continue with the course of prednisone, and (2) issued Plaintiff a medical shower pass to take daily showers in the cell block (i.e., gallery) from March 24, 2016 through April 15, 2016. (*Id.* ¶ 16-17.)

On April 8, 2016, Dr. Alam prescribed Plaintiff 1% Hydrocortisone cream, although they did not meet in person. (*Id.* ¶ 21.) When Plaintiff next saw Defendant Dr. Alam for a follow-up appointment for his rash on April 25, 2016, the rash appeared to have improved significantly. (*Id.* ¶ 23.) Yet as Plaintiff still had a dry rash, Dr. Alam prescribed a moisturizing cream and ammonium lactate. (*Id.* ¶ 23.)

*Medical Malpractice Lawsuit and Subsequent Medical Treatment*

On July 7, 2016, Plaintiff filed a lawsuit in the New York State Court of Claims alleging that Dr. Alam committed medical malpractice. (Def. 56.1 ¶ 24.) Subsequently, Dr. Alam saw Plaintiff on July 11, 2016 for a renewal of Plaintiff's asthma medication. (*Id.* ¶ 24.)

Dr. Alam also saw Plaintiff on October 18, 2016, where he prescribed Dulcolax and issued Plaintiff a medical shower pass for three months through January 18, 2017, allegedly due to Plaintiff's continued dry skin and complaints of hemorrhoids. (*Id.* ¶ 27.) Although Plaintiff agrees that Defendant prescribed a shower pass at this time, Plaintiff states that it was prescribed "solely and exclusively to treat the rashes and hives." (Plf. Resp. ¶ 27.)

Plaintiff next visited Dr. Alam on December 29, 2016 in order to be evaluated for constipation. (Def. 56.1 ¶ 28.) The parties dispute the events that occurred during this visit. Plaintiff alleges that, during the examination, Dr. Alam asked him, "why did you say I told you to take four tablets of Benadryl in that lawsuit?" and yelled "I never said that, I wouldn't say that!" Plaintiff further claims that Dr. Alam complained to him that he was trying to "scam" Dr. Alam, and that an argument then ensued. (Plf. Resp. ¶ 28.) Plaintiff alleges that this argument ended when Dr. Alam halted the examination and ordered Plaintiff to leave the examination room. (*Id.*)

Conversely, Dr. Alam claims that, during this visit, he simply evaluated Plaintiff for constipation and instructed Plaintiff to continue the course of medication as well as return to the clinic for a follow up in two months. (Def. 56.1 ¶ 28.)

Dr. Alam alleges that, on January 13, 2017, Plaintiff visited the clinic at Sing Sing (where he was seen by a nurse) and that he prescribed Plaintiff ammonium lactate, Eucerin cream, and an allergy medicine. (*Id.* ¶ 29.) However, Plaintiff counters that he is unable to confirm whether this visit occurred. (Plf. Resp. ¶ 29.)

Plaintiff again saw Dr. Alam on January 31, 2017, where Plaintiff complained that the ammonium lactate cream that Dr. Alam prescribed made his skin burn. (Def. 56.1 ¶ 29.) Dr. Alam discontinued the ammonium lactate cream, prescribed Plaintiff selenium sulfide lotion, prescribed Dulcolax for Plaintiff's constipation, and renewed Plaintiff's albuterol pump. (Def. 56.1 ¶ 30.) However, the parties disagree about the instructions for using the selenium sulfide that Dr. Alam gave to Plaintiff. Dr. Alam claims that he prescribed the selenium sulfide to be used twice a week and that he never diagnosed Plaintiff for tinea versicolor. (Def. 56.1 ¶ 30, 34.) Plaintiff counters that Defendant prescribed selenium sulfide for rashes and hives and that Defendant diagnosed this outbreak of rashes and hives as "tinea versicolor" and "hyper pigmentation," rather than dandruff (i.e., dermatitis) or another fungus issue. (Plf. Resp. ¶ 34.) Yet, the parties agree that: (1) to treat dermatitis the selenium sulfide can be applied to the affected areas for approximately five minutes, twice per week, and then washed off (Def. 56.1 ¶ 32; Plf. Resp. ¶ 32), and (2) selenium sulfide can also be used to treat a fungal skin infection and tinea versicolor but that, according to the manufacturing instructions, it would then need to be kept on for ten minutes and washed off every day for seven days. (Def. 56.1 ¶ 33; Plf. Resp. ¶ 33.)

On February 3, 2017, Plaintiff went to sick call, where he saw a nurse and requested a shower pass on the basis that he was unable to properly wash off the selenium sulfide. (Def. 56.1 ¶ 35.) However, Dr. Alam refused to issue a shower pass for Plaintiff because he believed it was possible for Plaintiff to use the selenium sulfide without one. (*Id.* ¶ 36.) Dr. Alam also claims that, as a matter of practice, he does not issue shower passes to incarcerated individuals to whom he prescribes selenium sulfide (*Id.* ¶ 36.)

Plaintiff returned to sick call to request a shower pass on February 7, 2017, where he was again refused a shower past and told that he could use the sink in his cell and/or the bathhouse to wash off the selenium sulfide. (*Id.* ¶ 36.) Plaintiff alleges that, when he explained it was not possible to use the sink or bath house to remove the selenium sulfide and that he intended to file a grievance, Dr. Alam responded "I don't care! Nothing is going to happen to me, like nothing is going to happen with that lawsuit." (Plf. Resp. ¶ 38.) On February 8, 2017, Plaintiff filed another grievance against Dr. Alam, alleging that Dr. Alam withheld the shower pass in retaliation for the malpractice lawsuit that he had filed on July 7, 2016. (Def. 56.1 ¶ 39.)

Plaintiff's prescriptions were renewed on March 16, 2017 and May 23, 2017. (*Id.* ¶ 40-41.) On June 9, 2017, Dr. Alam responded by email to Plaintiff's February 8, 2017 grievance. (*Id.* ¶ 42.) He stated that Plaintiff did not need a shower pass because he had prescribed Plaintiff the selenium sulfide lotion to be used only twice a week and every inmate is allowed three showers a week. (*Id.* ¶ 42.)

Another medical provider saw Plaintiff on July 31, 2017. (*Id.* ¶ 43.) Plaintiff then visited Dr. Alam on August 15, 2017 for a regularly scheduled asthma chronic care visit and, at this time, Dr. Alam refilled Plaintiff's prescriptions. (*Id.* ¶ 44.)

Plaintiff next saw Dr. Alam on October 13, 2017 for another regularly scheduled asthma chronic care appointment. (*Id.* ¶ 45.) At this appointment, Plaintiff reported a skin rash and anal fissure. (*Id.*) Dr. Alam prescribed Dulcolax, a moisturizing cream, vitamin d with calcium, and a shower pass for three months (from October 13, 2017 through January 13, 2018) to treat these conditions. (*Id.*)

On December 13, 2017, Plaintiff visited Dr. Alam for a regular physical. At this appointment, Dr. Alam issued Plaintiff a pass for a knee brace for the period from December 13, 2017 through March 13, 2018 and extended Plaintiff's shower pass through March 13, 2018. (*Id.* ¶ 46.) However, Plaintiff also alleges that Dr. Alam answered Plaintiff's question as to why Dr. Alam did not prescribe a shower pass earlier with the statement, "what did you expect me to do when you came in here screaming about grieving me and that lawsuit? You can't threaten to grieve me or throw that lawsuit in my face and thin[k] I'm going to still give you a shower pass." (Plf. Resp. ¶ 46.)

Plaintiff next visited Dr. Alam on February 21, 2018 for a chronic care appointment to monitor Plaintiff's asthma. (Def. 56.1 ¶ 48.) Although the purpose of the appointment was to monitor Plaintiff's asthma, Dr. Alam and Plaintiff discussed Plaintiff's persistent skin and hemorrhoid conditions. (*Id.*) Dr. Alam prescribed tucks pads and issued a medical shower pass for the period from February 21, 2018 through May 21, 2018. (*Id.* ¶ 49.) Dr. Alam states that this pass was provided to treat Plaintiff's hemorrhoid condition (*Id.*), whereas Plaintiff states it was prescribed exclusively to treat his ongoing skin condition. (Plf. Resp. ¶ 49.)

Plaintiff's next appointment with Dr. Alam was on September 19, 2018. (Def. 56.1 ¶ 51.) Dr. Alam renewed many of Plaintiff's prescriptions at this time, including his prescriptions for selenium sulfide and tucks pads. (*Id.*) Dr. Alam also issued Plaintiff a daily shower pass for the

period from September 19, 2018 through November 19, 2018. (*Id.*) Whereas Dr. Alam that he prescribed the shower pass for both Plaintiff's persistent skin and hemorrhoid conditions (*Id.* ¶ 51.), Plaintiff alleges that the shower pass was prescribed for the purpose of effectively using the Selenium Sulfide. (Plf. Resp. ¶ 51.)

Dr. Alam continued to provide medical care for Plaintiff until Plaintiff was released from incarceration in February of 2019. (Def. 56.1 ¶ 52.)

## **LEGAL STANDARDS**

### I.      **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This Rule states, in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents ... [and] affidavits or declarations," Fed.R.Civ.P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party, which must identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 244 (S.D.N.Y. 2001).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v.*

*Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the records" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed.R.Civ.P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292

9

(2d Cir. 2010) (the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

The Court must "extend extra consideration to a pro se plaintiff who is to be given 'special latitude on summary judgment motions.'" *Gabai v. Jacoby*, 800 F.Supp. 1149, 1153 (S.D.N.Y. 1992) (quoting *McDonald v. Doe*, 650 F.Supp. 858, 861 (S.D.N.Y. 1986)), and "[t]he papers of a party proceeding pro se should be read liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Lombardo v. Stone*, 99–CV–4603, 2001 WL 940559, at *5 (S.D.N.Y. Aug.20, 2001) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). Even a pro se plaintiff, however, "cannot defeat a motion for summary judgment by relying merely on the allegations of a complaint." *Wali v. One Source Co.*, 678 F.Supp.2d 170, 177 (S.D.N.Y. 2009). "[W]hen confronted with evidence of facts that would support summary judgment, the plaintiff must come forward with evidence in admissible form that is capable of refuting those facts." *Id.*

## II.    42 U.S.C. §1983

42 U.S.C. § 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. 42 U.S.C. § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that, "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S.

Constitution." *See Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010); *see also Castilla v. City of New York*, No. 09 Civ. 5446, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013). Therefore, a 42 U.S.C. § 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or her constitutional rights or privileges. *See Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also Quinn v. Nassau Cnty. Police Dep't*, 53 F.Supp.2d 347, 354 (E.D.N.Y. 1999) (noting that 42 U.S.C. § 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution").

## DISCUSSION

### I. First Amendment Retaliation Pursuant to 42 U.S.C. § 1983

Plaintiff alleges under 42 U.S.C. § 1983 that Defendant violated his First Amendment right to file a lawsuit. Specifically, Plaintiff alleges that Defendant refused to issue him a medical shower pass, which he claims he needed in order to use a selenium sulfate shower cream to treat a persistent skin condition, in retaliation for filing a medical malpractice lawsuit against Defendant.

#### A. Applicable Standard

Prisoners have a constitutional right to petition the government, and it is a violation 42 U.S.C. § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (citing *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). To state a First Amendment retaliation claim, Plaintiff must allege, "(1) that the speech or conduct at issue was protected, (2) that ... [D]efendant took adverse action against ... [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted); *see*

*also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015).

"[B]ecause virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with scepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.").

**B. Analysis**

As an initial matter, Plaintiff's malpractice lawsuit clearly constitutes protected conduct, so it is unnecessary for the Court to engage in an extensive analysis of the first element. *See Espinal v. Goord*, 558 F.3d. 119, at 128-29 (2d Cir. 2009); *see also Kotler v. Boley*, No. 21-1630, 2022 WL 4589678, at *2 (2d Cir. Sept. 30, 2022) (recognizing that, it is "well established" that filing inmate grievances is constitutionally protected conduct).

Regarding the second element of a First Amendment retaliation claim, the Court assesses adverse action by "look[ing] to the specific circumstances in which retaliation claims arise." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation

marks, and alterations omitted). "[T]he test, however, is not whether [the] plaintiff ... himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by [the] defendants to argue that the plaintiff was not chilled)." *Id.* at 353–54 (citation omitted). Rather, courts in the Second Circuit must determine if, "[i]t is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Burton v. Lynch*, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (citation omitted).

Plaintiff has failed to establish the adverse action element of a First Amendment retaliation claim. Even assuming *arguendo* that Plaintiff was unable to use the selenium sulfide effectively without a shower pass, Defendant's alleged retaliatory denial of treatment does not rise to the level of an adverse action because the harm Plaintiff suffered was *de minimis*. Courts in this Circuit have only found that a plaintiff met the adverse action element due to a defendant's retaliatory denial of treatment where the plaintiff suffered from markedly worse pain or injuries than those established here and/or where the defendant denied the plaintiff medical treatment for any of his medical conditions at all; indeed, as another court in this district recognized, although "a physician's retaliatory treatment may well constitute an adverse action, these cases involve the revocation of necessary medical rehabilitative treatment or the denial of medical treatment for injuries later requiring surgery." *Whitfield v. O'Connell*, No. 09 CIV. 1925 (WHP), 2010 WL 1010060, at *9 (S.D.N.Y. Mar. 18, 2010), *aff'd*, 402 F. App'x 563 (2d Cir. 2010); *see also Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at *10 (S.D.N.Y. April 6, 2018) (holding that the plaintiff's numerous allegations that prison doctor interfered with his medical passes, outright denied his requests for treatment recommended by another doctor, and

denied him any treatment while forcing him to wait at sick call once a week for two months, were sufficient to state an adverse action); *Thurmond v. Thomas-Walsh*, No. 18-CV-409 (KMK), 2019 WL 1429559, at *10 (S.D.N.Y. Mar. 29, 2019) (concluding that, "an alleged seven-week delay in receiving any effective medication, during which an inmate is allegedly in severe pain and bleeding… amounts to an adverse action").

    In the present case, whereas during the initial outbreak of Plaintiff's skin condition in March, 2016 Plaintiff was in "extreme" pain (and for a longer, undefined period, experienced a poor appearance from the aftermath of the rash), it is undisputed that following the initial course of treatment in the first month his condition improved significantly (Def. 56.1 ¶ 23), to the point that he felt uncomfortable rather than in pain. Indeed, although Plaintiff's skin condition varied in severity over the course of 2017, Plaintiff stated that after the initial outbreak in March, 2016 he would, "still get itches but not pain" and "wouldn't describe [his feelings from the rash] as pain, per se." (ECF No. 83-2, pg. 136.) During the period when Defendant did not prescribe Plaintiff a medical shower pass (i.e., from January to October of 2017) (Def. 56.1 ¶¶ 27, 45), Plaintiff's condition thereby amounted to a rash that, in his words, "made [him] uncomfortable." (ECF No. 83-2, pg. 133.)  It is also undisputed that Defendant treated Plaintiff's other medical conditions without interruption throughout Plaintiff's incarceration at Sing Sing, such as Plaintiff's hemorrhoids and asthma. (Def. 56.1 ¶ 52; *see also* ECF No. 81-4 pgs. 2-6.)

    Defendant's alleged retaliatory action (i.e., the denial of the shower pass) therefore amounted to a *de minimis* denial of treatment for an uncomfortable medical condition, in contrast to the denial of necessary rehabilitative treatment or where a prison doctor refused to treat any conditions at all from which a prisoner suffered. *See e.g.*, *Whitfield*, at *9 (S.D.N.Y. Mar. 18, 2010), *aff'd*, 402 F. App'x 563 (2d Cir. 2010) (holding that a prison doctor's denial of treatment was "*de minimis*" and

"fell far short of adverse action which would chill the speech of a similarly situation individual of ordinary firmness," where a prison doctor treated a prisoner roughly during a laser surgical removal of a wart, left a deep gash and portions of the wart behind, and failed to prescribe pain killers). Thus, even assuming *arguendo* that Defendant's refusal to prescribe a shower pass amounted to a retaliatory denial of medical care, and although the Court has sympathy for Defendant's suffering, this denial did not rise to the level of an adverse action that would deter a similarly situated individual of ordinary firmness from exercising his constitutional right to file a lawsuit. This is particularly true given that the Court must "approach prisoner retaliation claims with skepticism and particular care" and recognize that "prisoners may be required to tolerate more than average citizens." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted); *see also Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.").

Since Plaintiff has failed to make a showing sufficient to establish the existence of the adverse action element of a First Amendment retaliation claim, the Court does not need to address the third element of this claim, which asks whether there exists a causal connection between the protected conduct and the adverse action. *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014). On this basis, Defendant's motion for summary judgment on Plaintiff's First Amendment retaliation claim is granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. Plaintiff's request for compensatory and punitive damages is thereby denied, as is Plaintiff's

request for injunctive relief.[2]  The Clerk of the Court is respectfully requested to enter judgment in Defendant's favor. The Clerk of the Court is further respectfully requested to terminate the motion at ECF No. 76 and to terminate the action.

Dated:   November 10, 2022
        White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge

---

[2] Although Plaintiff requests that the Court issue an injunction order to provide Plaintiff a medical shower pass, this request is now moot, as Plaintiff is no longer incarcerated. (Def. 56.1 ¶ 52.)